Argued September 14; affirmed November 30, 1948. Petition for rehearing denied January 5, 1949. Motion to recall mandate January 21; motion granted February 8, 1949.

## RODDA *v.* RODDA
200 P. (2d) 616
202 P. (2d) 638

*Elton Watkins,* of Portland, argued the cause and filed a brief for appellant.

*Joe P. Price* and *M. E. Tarshis,* both of Portland, argued the cause and filed a brief for respondent.

LUSK, J.

The principal question on this appeal is whether a decree for separate maintenance rendered by a court

of this state in favor of a wife, survives a subsequent decree of divorce granted to the husband by a Nevada court. There is also involved a question, which must first be determined, as to whether the Nevada decree has extra-territorial validity.

On March 17, 1945, the Circuit Court for Multnomah County, Oregon, in a suit for divorce brought by the plaintiff and respondent, Dr. James M. Rodda, and in which Mrs. Rodda, the defendant and appellant, sought a decree of separate maintenance based upon cruel and inhuman treatment, entered a decree in her favor of separation for an unlimited time from her husband's bed and board with an allowance of $100.00 a month. In the year 1946 Dr. Rodda sued his wife for divorce in the District Court of the State of Nevada for the Second Judicial District, Washoe County, Nevada, and on June 19 that court awarded him a decree of divorce on the ground that he and his wife for three consecutive years immediately preceding the filing of such suit had lived separate and apart without cohabitation. (See § 9478.06, Nevada Comp. L., 1929, as amended by Ch. 23, Stat. of Nevada, 1939.) Mrs. Rodda, who was and is domiciled in this state, was served with summons by publication and by mail. She did not appear in the suit, and the Nevada court never acquired jurisdiction of her. The proceedings in that court were *ex parte*.

On December 13, 1946, Dr. Rodda filed in the Circuit Court for Multnomah County a motion, supported by affidavit, to vacate that part of the separate maintenance decree requiring him to pay his wife $100.00 a month, on the ground that the Nevada divorce wiped out that decree. There was an order to show cause why the motion should not be allowed, in response to which Mrs. Rodda filed a showing substantially to the effect

that the Nevada divorce decree was invalid and not entitled to full faith and credit in this or any other state. After a hearing, both upon affidavits and oral testimony, the court entered an order vacating the separate maintenance decree as of June 19, 1946, the date of the Nevada divorce decree. From that order Mrs. Rodda has appealed.

*First.* It is contended that the Nevada court acted without jurisdiction, and that its decree, therefore, is not entitled to full faith and credit under Art. IV, § 1, of the Constitution of the United States, which provides: ''Full faith and credit shall be given in each state to the public acts, records and judicial proceedings of every other state.''

 We are dealing with a matter of federal cognizance, and it is today established by the most recent decisions of the Supreme Court of the United States that a divorce decree granted by a state to one of its domiciliaries is entitled to full faith and credit in its sister states even though the other spouse was given notice of the divorce proceeding only through constructive service; that jurisdiction depends upon domicil; and that, while the finding of domicil by the court that granted the decree is entitled to *prima facie* weight, it is not conclusive in a sister state but may be relitigated there, the burden of undermining the verity which the foreign decree imports resting upon the assailant. *Estin v. Estin,* 334 U. S. 541, 92 L. ed. 1078, 68 S. Ct. 1213, 1 A. L. R. (2d) 1412; *Esenwein v. Commonwealth,* 325 U. S. 279, 89 L. ed. 1608, 65 S. Ct. 1118, 157 A. L. R. 1396; *Williams v. North Carolina,* 317 U. S. 287, 87 L. ed. 279, 63 S. Ct. 207, 143 A. L. R. 1273, 325 U. S. 226, 89 L. ed. 1577, 65 S. Ct. 1092, 157 A. L. R. 1366. In our opinion the appellant has failed to sustain that burden.

Jurisdiction in the Nevada court to decree a dissolution of the marriage depended upon the *bona fides* of Dr. Rodda's domicil in that state. His complaint alleged that he was a citizen of the United States and of the State of Nevada; that he had, for more than six weeks immediately before commencing suit, with the *bona fide* intent to make Nevada his home for an indefinite period of time, resided, been physically present, and domiciled in Washoe County, Nevada; and that he still so resided and was domiciled therein.

The defendant's evidence consisted largely in a showing respecting incidental and collateral matters, all of which together failed to show that Dr. Rodda did not, in good faith, acquire a Nevada domicil. Dr. Rodda himself admitted that he was aware that Nevada was a state in which divorce was comparatively easy to obtain, and that he went there with the intention of procuring a divorce. He had, however, other and more creditable reasons. He had made a special study of radiology at Georgetown University, and one of his professors there had told him that there was only one radiologist in the State of Nevada, and that Nevada should, therefore, be a good field for his practice. He arrived in Reno, Nevada, on March 26, 1946, and thereafter, for about two months, was employed there as assistant to the Nevada radiologist of whom his professor had told him. On April 23, 1946, Dr. Rodda filed an official application for a certificate authorizing him to practice medicine in Nevada, and therein stated his intention to reside in Nevada. On May 5, 1946, he successfully passed the Nevada Medical Board examination and was admitted to practice. From May 2 until November 22, 1946, he was employed as assistant by a firm of Reno architects. He registered as an elector in the State of Nevada and voted there in the

election of November 5, 1946. About March 15, 1947, he filed a federal income tax return, in which he gave his residence as Nevada. He maintained a bank account at Reno. From April 12, 1947, he practiced as a radiologist at Las Vegas, in Clark County, Nevada, and was still so practicing at the time of the hearing in the instant proceeding.

■ We are satisfied that Dr. Rodda established a *bona fide* domicil in Nevada. That being so, the fact that he went there for the purpose of procuring a divorce is immaterial. *Walker v. Walker*, 45 Nev. 105, 108, 198 P. 433; 3 Nelson, Divorce and Annulment, (2d ed.) § 33.34. The Nevada court, by virtue of Dr. Rodda's domicil in that state, had jurisdiction in his suit to dissolve the marriage. On this branch of the case the court is unanimous.

■ *Second.* In view of the foregoing this court is required to hold that the parties to this suit are no longer husband and wife and have not been since June 19, 1946, the date of the Nevada decree. But the "full faith and credit" which Oregon must give to the Nevada decree does not compel a decision that the separate maintenance decree has been wiped out. That is a question of Oregon law. Such is the effect of *Estin v. Estin,* supra, decided June 7, 1948., That case involved a New York separate maintenance decree in favor of the wife, and a subsequent Nevada divorce decree obtained by the husband, as in this case, on constructive service. The husband later moved in the New York courts to terminate the alimony provisions of the separate maintenance decree by reason of the Nevada decree. The motion was denied and judgment granted the wife on her motion for arrears of alimony, which judgment was affirmed on appeal. 296 N. Y. 308, 73 N. E. (2d) 113. Certiorari having been granted by the

Supreme Court of the United States, that court affirmed the New York court's judgment, holding that the conclusion of the highest court in New York "that a support order can survive divorce and that this one has survived petitioner's divorce" is "binding on us, except as it conflicts with the Full Faith and Credit Clause"; and that Nevada could not "under any circumstances adjudicate rights of respondent under the New York judgment when she was not personally served or did not appear in the proceeding." The court expressly approved *Bassett v. Bassett,* (C. C. A. 9th) 141 F. (2d) 954, which held that a provision in a Nevada divorce decree which attempted to release the husband from his obligations under a prior separate maintenance decree of New York—the Nevada court never having acquired jurisdiction of the wife—was not a bar to an action brought by the wife on her New York judgment in the Nevada Federal Court.

"The result of this situation", the Supreme Court said, "is to make the divorce divisible—to give effect to the Nevada decree insofar as it affects marital status and to make it ineffective on the issue of alimony". *Estin v. Estin,* supra, 334 U. S. at p. 549.

Three years before the Estin case, on May 21, 1945, the Supreme Court decided *Esenwein v. Commonwealth,* supra, on facts practically identical, except that the Pennsylvania court had found that the husband did not have a *bona fide* domicil in Nevada when he obtained his divorce. For that reason the court refused to relieve the husband from a prior Pennsylvania support order. The Supreme Court affirmed and said in the course of its opinion:

"Since, according to Pennsylvania law, a support order does not survive divorce, Commonwealth v. Parker, 59 Pa. Super. 74; Commonwealth v. Kur-

niker, 96 Pa. Super. 553, the efficacy of the Nevada divorce in Pennsylvania is the decisive question in the case. * * * The Pennsylvania Supreme Court rightly indicated that if merely the Nevada decree had been in evidence, it was entitled to carry the day. But the Supreme Court found that on the entire showing there was convincing countervailing evidence to disprove petitioner's intention to establish a domicil in Nevada." Esenwein v. Commonwealth, supra, 325 U. S. at pp. 280, 281.

■ It is clear from the foregoing decisions that upon the question now presented this state is free to pursue its own policy uninhibited by federal constitutional restrictions. The courts, however, are not charged with the responsibility of shaping the state's policy. That duty rests with the legislature. Our sole function is to construe the statute for the purpose of determining whether the provisions of the separate maintenance order and the altered status of the parties to this proceeding can coexist. We do not inquire whether the Nevada divorce decree of its own force terminates the Oregon decree, for the Supreme Court of the United States has held in the Estin case that it cannot; but we must determine whether, under Oregon law, the former husband is still obligated to support his former wife under that decree, notwithstanding the marriage relation has come to an end.

The separate maintenance statute, Oregon Laws, 1941, Ch. 408, provides for a decree of separation from bed and board, permanent or limited or unlimited in time, of "married persons" (§§ 1 and 2). When such decree has been granted the court is further empowered to render a decree for "the recovery from a party in fault such amount of money, in instalments, as may be just and proper for such party to contribute to the maintenance of the other" (§ 7). When the separation

is for an unlimited time (as here) "if either party believe that the cause for separation has ceased to exist, he or she may apply to the court for an order vacating the decree or modifying it on such terms as may appear to be just and proper" (§ 4). And likewise the court shall have the power to set aside, alter or modify so much of the decree as may provide for "the maintenance of either party to the suit" (§ 10).

It seems to us sufficiently obvious that what the legislature was concerned with in this act was the rights and duties of husband and wife as long as they continued to be such, and no longer. The statute speaks of a decree for the separation of "married persons". The decree for maintenance is made to depend upon the decree of separation from bed and board. The latter could have no possible efficacy after a divorce (since then the parties could not lawfully cohabit), and neither, therefore, could the former.

In short, the marriage relation constitutes the foundation of the order, and, upon the dissolution of that relation, or at least upon a showing of that fact to the Oregon court, it must be held that the order has lost all vitality.

It is pertinent to advert to what this court said on the subject of alimony in *Huffman v. Huffman*, 47 Or. 610, 614, 86 P. 593, 114 Am. St. Rep. 943:

> " * * * To understand the principle whereby alimony was given in divorce proceedings, a cursory examination of the rules originally applicable thereto in the country from which we derive the principles of common law may not be deemed inappropriate. In England, prior to 1858, no absolute judicial divorces were granted; but the ecclesiastical permitted legal separations, which were known as 'a mensa et thoro': Stewart, Mar. & Div. § 200. courts, assuming jurisdiction of the marital relation,

As an incident of such divorces and based on the husband's duty to support the wife, the church courts granted her, when she was not in fault, alimony, which consisted of an allowance that was measured by the social standing of the parties, proportioned by the wife's necessities and to the husband's financial ability, usually amounting to one half of their joint income; but, if there were children of the union, the allowance was generally limited to one third of such income: Stewart, Mar. & Div. § 362. The ecclesiastical courts having been abolished during the Commonwealth, the authority to award alimony was expressly conferred upon the equity judges, whose decrees in compliance therewith were ratified after the Restoration by an act of Parliament: 1 Bishop, Mar. & Div., § 1394. The law of England relating to marriage and divorce was brought by the colonists to this country, where the ecclesiastical courts were never recognized as possessing authority to allow alimony. As these immigrants did not bring their courts with them, the law adverted to, and which is here known as the unwritten or common law of the several States, remained in abeyance until called into activity by the creation of tribunals on which jurisdiction was directly or by implication conferred: Bishop, Mar. & Div., §§ 116, 121. A few courts of last resort in the United States have maintained that a grant of power to sever the marital relation carries with it by necessary intendment authority to allow permanent alimony in the absence of any enactment to that effect: Stewart, Mar. & Div. § 363. The great weight of judicial utterances, however, is to the effect that all authority to award alimony on decreeing a dissolution of the marriage must be found in the statute expressly conferring the right, which legislation is in general declaratory of the ecclesiastical law: 2 Bishop, Mar. & Div. § 1039; Stewart, Mar. & Div. § 364; Weber v. Weber, 16 Or. 163 (17 Pac. 866); Houston v. Timmerman, 17 Or. 499 (21 Pac. 1037, 4 L. R. A. 716, 11 Am. St. Rep. 848)."

See, to the same effect, *McFarlane v. McFarlane,* 43 Or. 477, 481, 73 P. (2d) 203, 75 P. (2d) 139, in which it was held that where a wife obtained a decree of divorce from an Oregon court on constructive service, her husband having deserted her and left the jurisdiction, the court was without power thereafter, when he returned to the state and was personally served with process, to enter a decree awarding alimony to the wife.

In *Alexander v. Alexander,* 13 App. D. C. 334, 45 L. R. A. 806, the court had occasion to review the subject of divorce and alimony at common law, and concluded its discussion by saying:

"Alimony has been defined to be 'the allowance which a husband by order of court pays to his wife, living separate from him, for her maintenance. Bishop, Marr. & Div. § 549.' Bouvier, Law Dictionary, title, *Alimony.* It is therefore, and it has always been held to be, apart from the express provisions of statutes authorizing divorce, an incident merely of separation by judicial decree from bed and board, and never of divorce from the bond of matrimony. See Crane v. McGinnis, 1 Gill & J. 463, 19 Am. Dec. 237. For at common law, and by the dictates of reason, in the absence of statutory enactment, to justify the allowance of alimony, the relation of husband and wife must continue to subsist, although the parties are separated from each other."

The foregoing (quoted with approval in *Holmes v. Holmes,* 81 U. S. App. D. C. 132, 155 F. (2d) 737, 166 A. L. R. 1000) harmonizes with the view of the law of this subject as heretofore enunciated by this court. See, also, *Spain v. Spain,* 177 Iowa 249, 252, 158 N. W. 529, L. R. A. 1917D 319, Ann. Cas. 1918E 1225; *McCoy v. McCoy,* 191 Iowa 973, 974, 183 N. W. 377.

■■ There are two sources of power in this state for

the award of alimony, and only two so far as the prior decisions of this court go. One is the statute which authorizes an allowance of alimony to the party not in fault in a divorce suit (§ 9-914 (3), O. C. L. A., as amended by Ch. 228, Oregon Laws, 1947); the other is the separate maintenance statute. The first is alimony after divorce, but the award may be made only when the court grants a decree of annulment or dissolution of the marriage. *McFarlane v. McFarlane,* supra; *Saurman v. Saurman,* 131 Or. 117, 122, 282 P. 111; *Hengen v. Hengen,* 85 Or. 155, 164, 166 P. 525; *Taylor v. Taylor,* 70 Or. 510, 519, 134 P. 1183, 140 P. 999. And see *State ex rel. Tolls v. Tolls,* 160 Or. 317, 323, 85 P. (2d) 366, 119 A. L. R. 1370. The second is alimony —termed maintenance—during the continuance of the marriage relation. And separate maintenance proceedings "being special and statutory, the court has only such powers as the legislature has granted it". *Noble v. Noble,* 164 Or. 538, 552, 103 P. (2d) 293.

By the enactment of Ch. 408, Oregon Laws, 1941, the legislature did not, in our opinion, intend to change the essential nature of alimony as incident to a judicial separation as it was known at common law. The statute makes many things specific which were formerly left to judicial discretion. It sets forth the grounds upon which a decree of separate maintenance may be based, and goes into detail in a number of other matters. It enlarges the scope of the relief by affording it to the husband as well as to the wife. But there is nothing to indicate that the statutory separation from bed and board with the attendant right to maintenance was to have legal characteristics and incidents differing from the common law legal separation "*a mensa et thoro*", one of which was indubitably the dependence of the right to maintenance upon

the continued subsistence of the relation of husband and wife.

■ Those courts which, as it seems to us, have given the question the best consideration, having in mind the nature of alimony as incident to a judicial separation, have held that a decree for separate maintenance cannot survive a subsequent decree of divorce. In *Harrison v. Harrison*, 20 Ala. 629, 56 Am. Dec. 227, it appeared that the parties were married in South Carolina and later moved to Alabama. The wife was forced to leave her husband by his illtreatment of her and returned to South Carolina, where she sued him for separate maintenance. He appeared in the case and contested it. The court granted her a decree. Subsequently the husband sued for and was granted a divorce in Alabama on the ground of abandonment. Service was by publication. After his death the wife brought an action of debt in Alabama to recover upon her South Carolina judgment for maintenance, and it was held that she was entitled to recover the arrears up to the time of the Alabama divorce but not beyond, the court saying (20 Ala. 649):

> "We are of the opinion that both decrees may stand, so far as in their results they are not incompatible with each other. The subject-matter and object of each are wholly different. The first seeks to enforce the obligations and duties springing out of the relation of marriage; the second, entirely to annul that relation, and having effected the contemplated object, puts a period to the operation of the first, which is necessarily dependent upon that relation."

In *McCullough v. McCullough*, 203 Mich. 288, 168 N. W. 929, upon a similar state of facts, the Michigan

court reached the same conclusion largely upon the authority of the Alabama decision. The McCullough case is followed in *Shaw v. Shaw*, 332 Ill. App. 442, 75 N. E. (2d) 411. The Massachusetts court in *Rosa v. Rosa*, 296 Mass. 271, 5 N. E. (2d) 417, held that a foreign decree of divorce, which it accepted as valid under its statute (this being before the decisions in the Williams cases), terminated a prior separate maintenance order of Massachusetts, at least after an order for its vacation was entered, the court saying that proceedings for separate support "are designed to secure the temporary support of a wife * * * while the marriage relation exists and the cause for separation continues."

In *Bloedorn v. Bloedorn*, 64 App. D. C. 199, 76 F. (2d) 812, there was a District of Columbia separate maintenance order followed by a divorce obtained by the husband in Virginia. It was held that the husband's obligations under the separate maintenance decree should be terminated as of the date when he applied for vacation of that decree in the District of Columbia courts. In *Cardinale v. Cardinale*, 8 Cal. (2d) 762, 68 P. (2d) 351, where there was a California separate maintenance decree followed by a Nevada divorce, it was held proper to terminate the maintenance as of the date of the divorce. See, also, *State v. Lynch*, 42 Del. 95, 28 Atl. (2d) 163; *Commonwealth v. Parker*, 59 Pa. Super. Ct. 74; *Commonwealth v. Kurnicker*, 96 Pa. Super. Ct. 553; *Esenwein v. Commonwealth*, supra; *Herrick v. Herrick*, 55 Nevada 59, 25 P. (2d) 378, and numerous decisions cited in both the prevailing and dissenting opinions in *Simonton v. Simonton*, 40 Idaho 751, 236 P. 863, 42 A. L. R. 1363.

The same principle was applied, although under different circumstances, in the recent case of *Calhoun*

*v. Calhoun,* 70 Cal. App. (2d) 233, 160 P. (2d) 923. The case arose out of a Nevada divorce obtained by a former resident of California from his wife. The wife afterwards sued him in California attacking the validity of the Nevada divorce on various grounds and seeking, among other things, an award of support money. It was argued that, as the Nevada court only granted a divorce and did not attempt to pass on the question of the support of the wife, the California courts could award the wife support money without violating the full faith and credit clause of the Constitution. The court said: "The answer to this argument lies in the fact that the power to award support grows out of the marital relation", citing *Howell v. Howell,* 104 Cal. 45, 37 P. 770, 43 Am. St. Rep. 70, where it was said: "After the judgment granting the divorce the plaintiff was no longer the wife of the defendant; and he owed her no longer any marital duty." It is worthy of note that the Howell case was cited and relied upon by this court in *McFarlane v. McFarlane,* supra.

There are decisions to the contrary, most of which, however, do not discuss the effect of the applicable statute or the nature of alimony and its dependence upon the marriage relation. See *Williams v. Williams,* 96 Ky. 397, 29 S. W. 132; *Robinson v. Robinson,* 250 Ky. 488, 63 S. W. (2d) 605; *Schimek v. Schimek,* 109 N. J. Eq. 395, 157 Atl. 649. The New Jersey court, while holding that a subsequent divorce does not terminate a previous decree for separate maintenance, holds somewhat inconsistently that a decree for maintenance cannot be granted after divorce, inasmuch as such a decree is dependent upon the existence of the marital relation between the parties. *Magowan v. Magowan,* 57 N. J. Eq. 195, 198, 39 Atl. 364. And

see *Gullett v. Gullett,* 80 U. S. App. D. C. 73, 149 F. (2d) 17. The English court in *Bragg v. Bragg,* L. R. P. Div. 20 (1925), found itself able to say that separate maintenance survived divorce by treating the words "husband" and "wife" in the statute as mere *"descriptio personarum"*. The basis of the decision of the New York Court of Appeals in the Estin case is somewhat obscure. (See Mr. Justice Frankfurter's dissenting opinion in that case, 334 U. S. 549, 1 A. L. R. 2d 1412) Mr. Justice Jackson, who also dissented, thought that under New York law a separate maintenance decree could not survive divorce, and it is of some interest to observe that on February 27, 1948, some ten months after the decision in the Estin case by the New York Court of Appeals, the Domestic Relation Court of the City of New York, upon substantially identical facts, came to exactly the opposite conclusion in *Liss v. Liss,* 77 N. Y. S. (2d) 242. The Estin case was not cited, but prior New York decisions were. *Weissberger v. Weissberger,* 40 N. Y. S. (2d) 416 (1943), is a similar decision. In *Simonton v. Simonton,* supra, there are dicta supporting the survival doctrine, but all that the case actually decided is that a decree for a support of a wife and minor children continues in effect up to the time that it is directly modified by reason of a subsequent divorce. The proceeding was not commenced until after the ex-husband's death. Other cases which are cited in support of the survival doctrine appear rather to go upon the theory that a court of equity has inherent jurisdiction to entertain an independent action for alimony after divorce. See, for example, *Wagster v. Wagster,* 193 Ark. 902, 103 S. W. (2d) 638. The subject will be found discussed in the following annotations: 42 A. L. R. 1375; 166 A. L. R. 1004; 1 A. L. R. (2d) 1423.

We have not thought it important to notice the distinction made by some of the courts between cases where the divorce is obtained on substituted service and those in which the court granting the decree had personal jurisdiction of the wife. In the latter class of cases—and particularly where the wife herself obtains the divorce—there may be additional grounds, such as res judicata, estoppel or waiver (see, e. g., *Holmes v. Holmes,* supra) for holding that a prior separate maintenance decree is terminated. Such cases do not, we think, affect the fundamental soundness of this decision.

The courts which hold that maintenance does not survive divorce are not in entire agreement on when the obligation under a maintenance decree terminates, some holding that it terminates as of the date of the foreign divorce decree (see cases cited in 1 A. L. R. (2d) 1435), others that termination takes effect as of the date a proceeding to vacate the maintenance decree is commenced. See *Bloedorn v. Bloedorn,* supra. In our opinion the former is the more logical view.

It is suggested that Oregon courts have inherent jurisdiction to award alimony after a divorce obtained in a sister state on constructive service. That is a question that has never been directly passed upon in this state and which, like most of the other really important questions in this case, has not been argued. The existence of such a jurisdiction may be difficult to reconcile with the reasoning employed and the principles approved in the Huffman and McFarlane cases previously cited. But the question is not before us and we express no opinion upon it. The case comes to us as an appeal from the Circuit Court's decree vacating the decree of separate maintenance as of the date of the Nevada divorce decree in response to a

motion for that purpose filed by the respondent, Dr. Rodda. Mrs. Rodda has not asked the court to make a new decree granting her alimony after divorce, but has stood and stands upon the ground that the Nevada divorce decree is invalid and therefore cannot impair the Oregon separate maintenance decree. We think it will be time enough to determine the question of inherent jurisdiction when such a case arises. Our present duty is to pass on the case which was presented to the Circuit Court and to this court.

■ As previously stated, the determination of Oregon's policy touching divorce and alimony is the province of the legislature, not of the courts. The existing separate maintenance statute was passed in 1941, and it is not likely that the problem presented by the facts of this case was then in the minds of the legislature or of those who drafted the measure. It could not then have been a serious problem, for that was before the Williams cases had overruled *Haddock v. Haddock,* 201 U. S. 562, 50 L. ed. 867, 26 S. Ct. 525, 5 Ann. Cas. 1. This state would then have been free to withhold recognition from a decree of divorce of a sister state obtained under the circumstances of this case. It could have held that, so far as Oregon is concerned, the parties to the suit were still husband and wife with every legal incidence pertaining to that relation. Today, however, under the new interpretation of Art. IV, § 1, of the Constitution of the United States, we are compelled to give full faith and credit to the Nevada "divisible" divorce, and so compelled, under the view we take of our own law, to hold that the consequences of the new status of the parties brought about by the divorce is the termination of the respondent's obligations under our own separate maintenance decree.

Of a similar result in *Bloedorn v. Bloedorn*, supra, the court said:

"* * * While appreciating the incongruity of this situation in fact, we must recognize its validity in law, under the faith and credit clause of the Constitution (Const. art. 4, § 1), and the statutory provisions and legal doctrines controlling the matter. The difficult remedy for this unwholesome condition may lie in a system of uniform divorce laws more liberal than the present statute of the District of Columbia."

It may be that the legislature of Oregon, if it is so minded, could adopt amendments, free from constitutional objections, to our separate maintenance statute, which would make it more difficult for husbands to free themselves of their obligations to support their wives, domiciled in this state, by going to another state and securing what have been referred to as "bargain counter" divorces.

*Third.* There are other objections to the decree of lesser importance which will be briefly considered. The Nevada court was not advised, either by the pleadings or otherwise, of the existence of the prior Oregon decree of separate maintenance. It is insisted that this was a fraud on the court, affecting its judgment to such extent that recognition thereof may and ought to be denied by the courts of Oregon. Fraud in the procurement of the judgment of a foreign state is recognized as ground for collateral attack upon the judgment. 3 Nelson, Divorce and Annulment, (2d ed.) §§ 33.30, 33.73; 27 C. J. S., Divorce, § 336; 50 C. J. S., Judgments, § 895; *Bartholomae Oil Corp. v. Booth*, 146 Or. 154, 163, 28 P. (2d) 1083; *Kissenbeck v. Kissenbeck*, 145 Or. 82, 85, 26 P. (2d) 58; *Stimson v. Stimson*, 140 Or. 507, 515, 13 P. (2d) 368; *Murray v. Murray*, 6 Or. 17, 24. The fraud, however, must have been

in the nature of "fraudulent representations, designed and intended to mislead, with knowledge of falsity, and resulting in damaging deception". It must have "gone to the jurisdiction of the court and been extrinsic or collateral to the matter tried in the foreign action". 27. C. J. S., Divorce, § 336; 50 C. J. S., Judgments, § 895. It is said that the fraud must have been such that it prevented the party complaining from making a full and fair defense. *Toledo Scale Co. v. Computing Scale Co.*, 261 U. S. 399, 421, 67 L. ed. 719, 43 S. Ct. 422. Be that as it may, it is apparent that the Nevada court's ignorance of the existence of the Oregon decree neither affected its jurisdiction nor its decision. Its jurisdiction was based upon domicil of the plaintiff in Nevada, and, as we have seen, such domicil was *bona fide*. Its holding that the parties, having lived separate and apart for three consecutive years, should be divorced, or, rather, that their marriage should be dissolved, was proper, under the Nevada statute, irrespective of what was the cause of the separation.

■ We are told that the trial court erred in permitting plaintiff's motion to vacate the decree to be supported by affidavits, and in denying defendant the right to take the depositions of witnesses. The practice of supporting and of opposing motions of this sort by affidavits is based upon statutory authority. O. C. L. A., § 4-201. There was no error in this respect. For the rest, the record does not show that the defendant was in any manner deprived of the right to take depositions.

■ It is argued that the evidence in the Nevada case (a transcript whereof is before us as an exhibit) did not establish that the living apart of the parties for three consecutive years had been "without cohabitation", as required by the statute. The judgment of a

court having jurisdiction may not be impeached collaterally because of insufficiency of evidence. 49 C. J. S., Judgments, § 432.

■ In accordance with these views the decree of the Circuit Court is affirmed. The proceedings being in equity and the circumstances what they are, it is ordered that the appellant shall receive her costs and disbursements.

HAY, J., dissenting:

Plaintiff and defendant intermarried in Ohio in 1935. Both parties, at that time, were students at the University of Michigan, where plaintiff was taking graduate work in architecture. Plaintiff is a native Oregonian, and, until 1946, had always claimed Oregon as his domicil. Leaving Michigan, they spent some time in Arizona and in southern California, and finally came to Oregon, where plaintiff abandoned architecture in favor of medicine as a career. He studied medicine at the medical school of the University of Oregon, and was graduated therefrom with the degree of M. D. in December, 1943.

On May 17, 1943, Dr. Rodda filed suit for divorce against Mrs. Rodda, in Multnomah County, Oregon. His amended complaint charged her with numerous specifications of cruel and inhuman treatment. Mrs. Rodda answered the complaint by general denial, and, as a counterclaim, prayed for a decree of separation and maintenance, under the provisions of chapter 408, Or. L., 1941, alleging as grounds therefor that plaintiff had himself been guilty of specified cruel and inhuman treatment toward her, had failed to provide her with adequate food and clothing, and had been unfaithful to her.

On March 17, 1945, after a hearing in which both parties participated, the court made general findings

in favor of the defendant, Mrs. Rodda, and against the plaintiff, and awarded her a decree of separation from bed and board for an unlimited period of time, with an allowance of $100 a month for maintenance.

On May 16, 1946, Dr. Rodda brought suit for divorce in the District Court of the State of Nevada for the Second Judicial District, Washoe County, upon the ground that, for the three consecutive years immediately preceding, he and his wife had lived separate and apart without cohabitation. (Sec. 9467.06, Nev. Comp. L., 1929, as amended by chapter 23, Statutes of Nevada, 1939.) Substitute service only was had upon Mrs. Rodda, and, on the advice of counsel, she made no appearance. There was an ex parte hearing, and the Nevada court, on June 19, 1946, entered a decree of divorce as prayed for.

On December 13, 1946, Dr. Rodda filed in the Circuit Court for Multnomah County, Oregon, his motion to vacate, as of the date of the Nevada decree, that part of the Oregon decree which required him to pay Mrs. Rodda $100 a month for her maintenance. In response to an order to show cause why the motion should not be allowed, Mrs. Rodda, inter alia, pleaded the decree of separation and maintenance. After a hearing, the court, on July 10, 1947, entered its decree vacating the decree of separate maintenance as of June 19, 1946, the date of the Nevada decree. From this order Mrs. Rodda has appealed to this court.

Consideration of what recognition must be given to the Nevada decree by our courts involves a federal question under the full faith and credit clause of the Constitution of the United States (Art. IV, section 1). The decisions of the Supreme Court of the United States interpreting the full faith and credit clause are controlling. *DeVall v. DeVall*, (1910) 57 Or. 128, 109

P. 755, 110 P. 705; *Williams v. North Carolina*, (1942) 317 U. S. 287, 298, 87 L. ed. 279, 63 S. Ct. 207, 143 A. L. R. 1273; *Williams v. North Carolina*, (1945) 325 U. S. 226, 231, 89 L. ed. 1577, 65 S. Ct. 1092, 157 A. L. R. 1366; 3 Nelson, Divorce and Annulment, 2 ed., section 33.24.

In *Haddock v. Haddock*, (1906) 201 U. S. 562, 50 L. ed. 867, 26 S. Ct. 525, 5 Ann. Cas. 1, the facts were as follows: A husband and wife had been domiciled in the State of New York. The husband deserted the wife and, after a lapse of years, acquired, in good faith, a domicil in Connecticut. The wife remained in New York. In Connecticut, the husband procured a decree of divorce, based upon constructive service of process only. The wife afterward brought suit in New York for separation from bed and board and for alimony, and obtained personal service upon the husband in that state. He pleaded the Connecticut decree. It was held that that decree, not being based upon personal service, was not entitled to obligatory enforcement in the State of New York under the full faith and credit clause of the federal constitution. The court was of the opinion that a suit for divorce, brought in a state other than that of the matrimonial domicil against the wife who remained in the matrimonial domicil, was not a proceeding *in rem* justifying the court to enter a decree affecting the *res,* or marriage relation, entitled to be enforced outside of the territorial jurisdiction of the court. The doctrine thus enunciated was followed by the courts for more than thirty-five years. *Toncray v. Toncray,* (1910) 123 Tenn. 476, 131 S. W. 977, 34 L. R. A. N. S., 1106; *Hicks v. Hicks,* (1912) 69 Wash. 627, 125 P. 945; *Bennett v. Tomlinson,* (1928) 206 Iowa 1075, 221 N. W. 837; *Lednum v. Lednum,* (1929) 85 Colo. 364, 276 P. 674; *Larrick v. Larrick,*

(1930) 39 Ohio App. 363, 177 N. E. 642; *Sheridan v. Sheridan,* (1942) 213 Minn. 24, 4 N. W. 2d 785. The Haddock case was specifically overruled in the first Williams case, supra (317 U. S. 287). That case, however, did not involve the question of obligatory recognition of a foreign-state decree of divorce based upon substituted service, when such decree is sought to be relied upon as absolving the husband from his duty to pay alimony adjudged against him in a prior suit for separate maintenance in the wife's home state, based upon personal service. It would seem, therefore, that the court's statement in *Williams v. North Carolina,* supra (317 U. S. 287) that *"Haddock v. Haddock* is overruled"*, should be regarded as being limited within the scope of that decision, and not as implying a sweeping overruling of the whole of *Haddock v. Haddock.*

I agree with the majority opinion that Dr. Rodda established a bona fide domicil in Nevada, and that the Nevada court had jurisdiction of his suit to dissolve the marriage.

The most recent decision of the federal Supreme Court upon the impact of the full faith and credit clause on the situation in the instant case is *Estin v. Estin,* (1948) 334 U. S. 541. The controversy which the opinion in that case terminated arose in the State of New York. The plaintiff wife, in 1943, was awarded a judgment of permanent separation from bed and board, with alimony. The husband had entered a general appearance in the cause. Some two years later, on constructive service upon the wife, the husband obtained a decree of divorce in Nevada. He thereupon ceased paying alimony under the New York judgment, and in due course the wife brought an action for the amount thereof accrued and unpaid. The husband appeared in the action, and, based upon the Nevada

decree of divorce, moved to vacate the alimony provisions of the separation judgment. The wife had judgment in the lower court (*Estin v. Estin*, (1946) 63 N. Y. S. 2d 476, aff. without opinion, 271 App. Div. 829, 66 N. Y. S. 2d 421). On appeal, the Court of Appeals affirmed, holding that, while, under the full faith and credit clause, the Nevada decree was entitled to recognition by New York as dissolving the marriage, it did not have the effect of terminating the liability of the husband for alimony under the prior New York judgment. I quote from the opinion:

"We have then this situation: The full faith and credit clause commands us to accord recognition to so much of the Nevada decree as pronounced the dissolution of the marriage; and the only remaining question is whether the Nevada decree must also be taken to have cancelled the alimony provision made for the wife through the prior judgment in this New York separation action.

"A divorce decree (whether foreign or domestic) granted by a court having jurisdiction of the persons of both parties may very well be held to override any incongruous alimony provision of an earlier domestic judgment of separation. See Scheinwald v. Scheinwald, 231 App. Div. 757, 246 N. Y. S. 33; Richards v. Richards, 87 Misc. 134, 149 N. Y. S. 1028; affirmed 167 App. Div. 922, 152 N. Y. S. 1140; Holmes v. Holmes, 81 U. S. App. D. C. 132, 155 F. 2d 737, 166 A. L. R. 1000. But the res judicata principle of the cases just cited—that as between two conflicting adjudications the last must control—has no application where, as in the present case, the court which granted the last judgment was without jurisdiction of the person of the defendant. Cf. Miller v. Miller, 200 Iowa 1193, 206 N. W. 262; Wagster v. Wagster, 193 Ark. 902, 103 S. W. 2d 638; 2 Freeman on Judgments, 5th ed., § 629. * * *"

Estin v. Estin, (1947) 296 N. Y. 308, 73 N. E.

2d 113, 114, affirmed Estin v. Estin, (1948) supra (334 U. S. 541, 92 L. ed. 1078, 1082, 1083, 68 S. Ct. 1213, 1 A. L. R. 1412.)

When the case reached the Supreme Court of the United States, it was affirmed (by a divided court, Justices Frankfurter and Jackson dissenting). The effect of the decision is that, while a decree of divorce of a sister state, based upon constructive service, is entitled to full faith and credit as a dissolution of the marriage, it does not terminate the wife's right to separate maintenance under a previous decree in the state of the matrimonial domicil, unless, by the law of the latter state, the separation decree does not survive the decree of divorce. I quote from the opinion:

"* * * In this case New York evinced a concern with this broken marriage when both parties were domiciled in New York and before Nevada had any concern with it. New York was rightly concerned lest the abandoned spouse be left impoverished and perhaps become a public charge. The problem of her livelihood and support is plainly a matter in which her community had a legitimate interest. The New York court, having jurisdiction over both parties, undertook to protect her by granting her a judgment of permanent alimony. Nevada, however, apparently follows the rule that dissolution of the marriage puts an end to a support order. See Herrick v. Herrick, 55 Nev. 59, 68, 25 P. 2d 378, 380. *But the question is whether Nevada could under any circumstances adjudicate rights of respondent under the New York judgment when she was not personally served or did not appear in the proceeding.*

"Bassett v. Bassett, 141 F. 2d 954, held that Nevada could not. We agree with that view.

"* * * The Nevada decree that is said to wipe out respondent's claim for alimony under the New York judgment is nothing less than an attempt by Nevada to restrain respondent from asserting her

claim under that judgment. That is an attempt to exercise an in personam jurisdiction over a person not before the court. That may not be done. Since Nevada had no power to adjudicate respondent's rights in the New York judgment, New York need not give full faith and credit to that phase of Nevada's judgment. A judgment of a court having no jurisdiction to render it is not entitled to the full faith and credit which the Constitution and statute of the United States demand. Hansberry v. Lee, 311 U. S. 32, 40, 41 (85 L. ed. 22, 26, 27, 61 S. Ct. 115, 132 A. L. R. 741); Williams v. North Carolina, 325 U. S. 226, 229, (89 L. ed. 1577, 1581, 65 S. Ct. 1092, 157 A. L. R. 1366), and cases cited.

"The result in this situation is to make the divorce divisible—to give effect to the Nevada decree insofar as it affects marital status and to make it ineffective on the issue of alimony. It accommodates the interests of both Nevada and New York in this broken marriage by restricting each State to the matters of her dominant concern." (Emphasis supplied.) Estin v. Estin, supra (334 U. S. 541, 92 L. ed. 1078, 1082, 1083.)

In the Bassett case, above mentioned, the facts were: William and Margaret Bassett, husband and wife, were domiciled in the State of New York. William left New York and established his domicil in Nevada. Thereafter, Margaret sued in New York for separate maintenance, and secured a judgment therefor, payable in monthly installments. Subsequently, she obtained two several judgments in the New York court for unpaid installments. William thereafter obtained a decree of absolute divorce in Nevada, upon substituted service on Margaret, who made no appearance in the suit. Margaret then brought an action upon her New York judgments in the District Court of the United States for the District of Nevada. William pleaded the Nevada divorce decree as a bar. The Dis-

trict Court sustained the defense and dismissed the action. On appeal, the Circuit Court of Appeals reversed. In so doing, it based its decision mainly upon its earlier decision in *Durlacher v. Durlacher*, 9 Cir., 123 F. 2d 70, in which, under substantially identical facts, it had held that a valid judgment of the New York court could not be set aside or affected by a judgment of a court of another state. Counsel, in the Bassett case, argued that *Durlacher v. Durlacher* was decided upon the theory of *Haddock v. Haddock*, supra (201 U. S. 562); that the Haddock case was reversed by *Williams v. North Carolina*, supra (317 U. S. 287); and, therefore, that *Durlacher v. Durlacher* was no longer an authoritative precedent. In disposing of this contention, the court said that the New York court had acquired jurisdiction over both parties in the original separate maintenance action, and, according to New York law, retained jurisdiction throughout the proceedings leading to the two judgments for accrued installments thereunder; that, in those proceedings, William could have appeared and pleaded any defense he might have had, but failed to do so, and that, if he had appeared and unsuccessfully asserted his defenses, if any, his recourse would have been in the appellate courts of New York and the Supreme Court of the United States. Concluding, the court said:

> "As here presented we are asked to accept the decree of a Nevada State Court which, in effect, attempts to set aside decrees or judgments of a court of New York. This is the point in this appeal, and Williams v. North Carolina, supra, has absolutely nothing to do with it."

In the case at bar, the award of alimony to Mrs. Rodda was made under authority of the state statute providing that, upon certain stated grounds, either

spouse may have a decree of separation from bed and board, with (among other relief) an award of alimony against the party in fault. Chapter 408, Or. L., 1941. The statute makes each installment of such alimony, as it accrues, a final judgment, and provides that the court shall have power, upon motion of either party, to set aside, alter or modify so much of the decree as may provide, inter alia, for the maintenance of the other party. The Oregon court, therefore, retained jurisdiction over the parties. Its decree, denying the divorce which Dr. Rodda prayed for and allowing Mrs. Rodda's prayer for separation and maintenance, was conclusive as to the adjudicated rights of the parties and a bar to any subsequent suit upon the same matters. 30 Am. Jur., Judgments, section 172; 27 C. J. S., Divorce, section 326; *Faist v. Faist,* (1934) 147 Or. 623, 628, 34 P. 2d 937; *Kelley v. Kelley,* (1948) Or., 191 P. 2d 656, 659.

The inquiry, in my opinion, involves the question of whether or not, under the law of Oregon, the Oregon decree of separate maintenance was terminated *ipso facto* by the Nevada decree of absolute divorce. There is nothing in the separate maintenance statute itself (ch. 408, Laws, 1941) to indicate that the legislature intended or contemplated that the latter decree should have such an effect. Dr. Rodda has made no showing of any change in conditions affecting his liability for alimony, occurring since the entry of the separate-maintenance decree, other than the entry of the Nevada decree.

"Alimony is the allowance which the husband is compelled to pay for his wife's maintenance while she is living apart from him, or after she has been divorced. * * * It is founded upon the marital obligation to support and maintain, and is awarded by the court in

enforcement of this obligation and duty." Keezer, Marriage and Divorce, 2 ed., section 660; *Warrington v. Warrington,* 160 Or. 77, 80, 83 P. 2d 479; 27 C. J. S., Divorce, section 202c. Under our law, a divorce may be awarded either with or without alimony, and, conversely, alimony, or separate maintenance, may be awarded without divorce. There is, therefore, no "necessary connection between divorce and alimony". *Toncray v. Toncray,* supra (1910—123 Tenn. 476, 131 S. W. 977, 34 L. R. A. (N. S.) 1106, 1109). The right to alimony, being founded upon the duty of the husband to support the wife, and being unaffected by the foreign ex parte decree of divorce, may, in my opinion, survive that decree.

There is respectable authority, apart from *Estin v. Estin,* supra, for the proposition that a decree of absolute divorce is not a mandatory ground for termination of a prior award of separate maintenance. See Anno., 166 A. L. R. 1004, 1018, and cases cited.

In *Esenwein v. Commonwealth,* (1945) 325 U. S. 279, 89 L. ed. 1608, 65 S. Ct. 1118, 157 A. L. R. 1396, Mr. Justice Douglas, in a specially concurring opinion, foreshadowed the later decision in *Estin v. Estin,* supra, in the following language:

> " * * * it is not apparent that the spouse who obtained the decree can defeat an action for maintenance or support in another State by showing that he was domiciled in the State which awarded him the divorce decree. It is one thing if the spouse from whom the decree of divorce is obtained appears or is personally served. See Yarborough v. Yarborough, 290 U. S. 202, 90 A. L. R. 924; Davis v. Davis, 305 U. S. 32, 118 A. L. R. 1518. But I am not convinced that in absence of an appearance or personal service the decree need be given full faith and credit when it comes to maintenance or support of

the other spouse or the children.. See Pennoyer v. Neff, 95 U. S. 714. The problem under the full faith and credit clause is to accommodate as fully as possible the conflicting interests of the two States. See Magnolia Petroleum Co. v. Hunt, 320 U. S. 430, 447 (dissenting opinion). The question of marital capacity will often raise an irreconcilable conflict between the policies of the two States. See Williams v. North Carolina, supra. One must give way in the larger interest of the federal union. But the same conflict is not necessarily present when it comes to maintenance or support. The State where the deserted wife is domiciled has a deep concern in the welfare of the family deserted by the head of the household. If he is required to support his former wife, he is not made a bigamist and the offspring of his second marriage are not bastardized. In that view Pennsylvania in this case might refuse to alter its former order of support or might enlarge it, even though Nevada in which the other spouse was domiciled and obtained his divorce made a different provision for support or none at all. See Radin, The Authenticated Full Faith and Credit Clause, 39 Ill. L. Rev. 1, 28.''

The separate-maintenance decree herein was granted at a time when the parties were husband and wife. If the rule of *Haddock v. Haddock,* supra, were still in force, Oregon would no doubt decline to recognize or to give effect to the Nevada divorce decree, to any extent whatever. By the Supreme Court's present interpretation of the Fourth Amendment, however, we are compelled to recognize the Nevada decree as dissolving the marriage, but we are not obliged to recognize the ''divorcing effect'' of such decree to be sufficient to cut off the wife's right to separate maintenance under the prior decree. It is true that the Nevada decree has given to Dr. Rodda the status of an unmarried man to the extent that he may lawfully contract a

second marriage, but I am of the opinion that sufficient of the doctrine of *Haddock v. Haddock* remains to permit the Oregon court to refuse recognition to that decree as terminating the decree of separate maintenance. Distinguished legal scholars have not hesitated to say that the divorced wife, in such a situation, may be regarded by the state of her domicil, for the purpose of receiving separate maintenance under the previous decree, as if she were still "the wife". See Bingham, In the Matter of Haddock v. Haddock, 21 Cornell Law Quar., 393, 420; Cf., Radin, The Authenticated Full Faith and Credit Clause; Its History, 39 Ill. L. Rev., 1, 28.

"It is not essential to the allowance of alimony that the marriage relation should subsist up to the time it is allowed. On appeal, alimony may be decreed by the district court, notwithstanding the subsisting divorce pronounced by the court of common pleas. It is true the statute speaks of the allowance as being made to the wife. But the term 'wife' may be regarded as used to designate the person, and not the actual existing relation; or the petitioner may still be regarded as holding the relation of wife for the purpose of enforcing her claim to alimony."

Cox v. Cox, 19 Ohio St. 502, 2 Am. Rep. 415, 417.

In *Bragg v. Bragg,* (1925) Prob. (Eng.) 20—Div. Ct., a wife had obtained an order, under a summary jurisdiction act, (Summary Jurisdiction — Married Women—Act, 1895) whereby her husband was declared to have deserted her and was ordered to pay her a certain sum weekly for the maintenance of herself and their children. Three years later the wife obtained a decree nisi for a dissolution of the marriage, which decree made no provision for maintenance of herself or children. The decree was afterward made absolute. It was held that the divorce decree and the termination

thereby of the marriage status of the parties did not, in and of itself, terminate the prior order for maintenance, and that, before the husband could be relieved from liability under the order for maintenance, he would be required to satisfy the court that justice required that he be so relieved. The portion of the act under which the order was authorized read as follows:

" * * * [The order may contain] (3) A provision that the husband shall pay to the wife personally * * * such weekly sum * * * as the court, having regard to the means of the husband and wife, considers reasonable * * *."

The court, apparently, was not troubled by any legalistic notion that the divorce decree divested the support order of the basis, in the marital status of the parties, upon which it was founded.

Similarly, the New York statute upon which the separate-maintenance decree in *Estin v. Estin,* supra, was granted, provides as follows:

"Where an action for separation from bed and board is brought by the wife, the court, in the final judgment of separation, may give such directions as the nature and circumstances of the case require. In particular, it may compel the defendant to provide suitably for the education and maintenance of the children of the marriage and for the support of the plaintiff, as justice requires, having regard to the circumstances of the respective parties. And the court, in such an action, may render a judgment compelling the defendant to make the provision specified in this section where, under the circumstances of the case, such a judgment is proper, without rendering a judgment of separation."

Gilbert-Bliss: Civil Practice of New York, Annotated, Book 6A, section 1164.

Notwithstanding the designation of the woman as "the

wife", the court held that a judgment of separation and maintenance survived a subsequent ex parte decree of divorce awarded to the husband in a sister state.

I submit that justice and equity require that the designation of the parties as "husband" and "wife", or as "married persons", in our statute, should be regarded, in circumstances such as those in the instant case, as mere *descriptio personarum*. It is to be remembered that statutes providing for separate maintenance are remedial in character and should be liberally construed. 42 C. J. S., Husband and Wife, section 614. This court should hold that the prior decree of separate maintenance was not terminated by the Nevada ex parte decree of divorce. *Estin v. Estin,* supra (334 U. S. 541); *Cox v. Cox,* supra; *Schimek v. Schimek,* (1931) 109 N. J. Eq. 395, 157 A. 649; *Robinson v. Robinson,* (1933) 250 Ky. 488, 63 S. W. 2d 605; *Wagster v. Wagster,* (1937) 193 Ark. 902, 906, 103 S.W. 2d 638; *Simonton v. Simonton,* (1925) 40 Ida. 751, 236 P. 863, 42 A. L. R. 1363, and Anno., 1375.

We have held that "the public policy of this state has no sympathy for those who seek to shirk the duty imposed by decrees directing the payment of support money". *Cousineau v. Cousineau,* 155 Or. 184, 201, 63 P. 2d 897, 109 A. L. R. 643. To give to the Nevada decree the effect which Dr. Rodda seeks here,

" * * * would be to offer a premium to all discontented husbands by way of deserting their wives and obtaining a * * * divorce in a foreign jurisdiction, and thus [relieving] * * * [themselves] of all obligations to pay any alimony, allowance, or support. It would thus put it in the power of the husband to do, through the instrumentality of a foreign jurisdiction, what he could not do in the courts where he and his wife both resided. We are not disposed to sanction so great an imposition upon

our own citizens, and the domestic policy of our own state. * * * ''

*Cook v. Cook,* (1882) 56 Wis. 195, 14 N. W. 33, 40, 43 Am. Rep. 706.

I note the suggestion by Mr. Justice Brand that the Oregon courts have inherent equitable jurisdiction to award alimony upon an independent suit therefor instituted subsequent to an ex parte divorce obtained in a sister state. I am in sympathy with that view. I think, however, that the point does not arise upon the record in this case. The only issue presented here, as I see it, is whether or not the ex parte divorce decree of a sister state terminated *ipso facto* the husband's liability under the previous decree of separate maintenance. Conceding Mr. Justice Brand's contention, however, it should be apparent that if, after such an ex parte divorce, the courts may still award alimony, it must be upon the theory that the husband's duty to support his former wife survives the divorce. When that duty of support has been merged into a decree of separate maintenance, to say, in effect, that, because the full faith and credit clause compels us to recognize the bare divorce, the husband's duty of support may be continued only by transmuting the separate-maintenance decree into one for alimony, is, it seems to me, an inequitable insistence upon form rather than substance.

As the majority opinion states, it is not likely that the problem presented by the facts in this case was in the minds of our legislature in 1941, when our separate-maintenance statute was adopted, as the rule of *Haddock v. Haddock* was then still being followed, and the courts of this state no doubt would have refused to recognize such a decree as the present Nevada one in any respect whatever. It would seem that the legis-

lators could not have conceived that anyone would ever suggest that an erring husband might be relieved of his duty to support his wife by the mere force of an ex parte divorce obtained by him in a sister state. Even farther still from their minds must have been the thought that a divorce having the effect suggested might be secured ex parte by an erring husband against an innocent wife, without a showing of any equity in his favor, and without proof that she was at fault in any respect.

The financial burden imposed upon Dr. Rodda by the separate-maintenance decree was not heavy. Mrs. Rodda, broken in health, and no doubt seriously in need of the small contribution toward her support which the decree awarded, may very well, as a result of the affirmance of the lower court's order, become impoverished and an object of public charity. That one of its citizens may be placed in such a situation by the ex parte decree of a sister state is a matter of vital concern to the State of Oregon, and that concern should be a sufficient reason in law to justify its courts in maintaining the integrity of the prior Oregon decree. *Estin v. Estin,* supra (334 U. S. 541). The legislature, when it convenes, may perhaps, by an amendment of the separate maintenance act, give verbal assurance, beyond the possibility of judicial doubt, that, under circumstances such as these, a decree of separate maintenance will survive a subsequent ex parte decree of divorce. But, in the meantime, the Oregon court will have lost jurisdiction over Dr. Rodda, and the legislative action, if any should eventuate, will come too late to be of any benefit to Mrs. Rodda.

The decision of the majority to vacate the separate-maintenance decree, upon the ground that the parties are no longer husband and wife, is, in my opinion, con-

trary to public policy and inequitable. It gives to the Nevada decree the effect of an *in personam* judgment against the defendant, although the court had no jurisdiction over her person. Moreover, the insistence of the majority that the dissolution of the marital status by the ex parte decree destroyed *ipso facto* all of the "incidents" of the marriage, including the wife's rights to alimony under the decree of separation, merely because she is no longer "the wife" in the full sense of the term, implies, as I think, an unrealistic deference to the niceties of semasiology.

Dr. Rodda is appealing to a court of equity to relieve him from the burden which was lawfully imposed upon him by that court. His action, in resorting to the Nevada court to procure a divorce which had been denied him in Oregon, in so far as such action was evidently motivated by a desire to evade payment of alimony which had been justly awarded by an Oregon court to the wife whom he had wronged, demonstrates that, for his own part, he is unwilling to do equity. The allowance of his motion to vacate the decree of separate maintenance will have the effect of depriving Mrs. Rodda of all remedies which are now available to her for the enforcement of her just rights in the premises. A court of equity ought not to lend its aid to the accomplishment of an inequitable scheme. The fact that the mere letter of the statute may be insufficient to chart a course of procedure adequate to meet the exigencies of a novel situation, should not prevent a court of equity from adopting whatever mode of proceeding may be necessary to carry out the spirit of the law. Section 13-715, O. C. L. A.; *Cousineau v. Cousineau,* supra; *Bartlett v. Bartlett,* 175 Or. 215, 243, 152 P. 2d 402.

> "Courts which have a true conception of the philosophy of equity constantly reiterate the fact

that equity meets all conditions; that human ingenuity and human affairs can not create a condition which the long arm of the court of equity cannot reach if injustice or wrong would otherwise result. See Harrigan v. Gilchrist, 121 Wis. 127, 99 N. W. 909, 936; Rice v. Van Vranken, 132 Misc. 82, 229 N. Y. S. 32.'' Teachers' Retirement Fund Ass'n v. Pirie, 150 Or. 435, 445, 46 P. 2d 105.

'' * * * the conception of law as a means toward social ends, the doctrine that law exists to secure interests, social, public and private, requires the jurist to keep in touch with life. Wholly abstract considerations do not suffice to justify legal rules under such a theory. The function of legal history comes to be one of illustrating how rules and principles have met concrete situations in the past and of enabling us to judge how we may deal with such situations in the present, rather than one of furnishing self-sufficient premises from which rules are to be obtained by rigid deduction.'' Pound: The Scope and Purpose of Sociological Jurisprudence, p. 146.

The foregoing considerations, which appear to me to be compelling, have moved me thus to register my respectful dissent from the majority opinion herein.

KELLY, J., concurs in the foregoing dissenting opinion.

BRAND, J., dissenting.

I agree with the majority in the following respects: (1) Dr. Rodda established a bona fide residence in Nevada; (2) The Nevada court had jurisdiction to divorce the parties; (3) The Full Faith and Credit Clause requires the Oregon court to recognize that the plaintiff and defendant are no longer married persons; (4) The effect of the Nevada divorce on the Oregon separate maintenance decree presents a question of Oregon law unaffected by the Full Faith and

Credit Clause; (5) The Oregon separate maintenance law relates to the duties between married persons. That statute cannot serve as the basis for an order requiring the payment of alimony for any period subsequent to the time when the Nevada decree has been brought to the attention of the Oregon court; (6) Under our previous decisions, the authority of an Oregon court to award alimony in a separate maintenance suit or to award alimony as an incident of an Oregon divorce, is limited by the provisions of the Oregon statutes.

I do not agree that an Oregon court of equity is powerless to do justice in a case such as this which is not covered by any Oregon statute. I do not agree that we are limited to determining "whether under Oregon law the former husband is still obligated to support his former wife *under that decree*". (Italics mine). I suggest that there is another legal basis aside from the statute under which the lower court in this case may determine whether or not a decree should be rendered requiring Dr. Rodda to continue to support his former wife. That basis, as I shall attempt to show, is the inherent power of equity. I have no quarrel with the actual decision in *Huffman v. Huffman,* 47 Or. 610, 86 P. 593, cited by the majority. It relates to the power of an Oregon court to make awards incident to a divorce decree under then existing statutes. The case was decided in 1906. In that case it was said, "The great weight of judicial utterances, however, is to the effect that all authority to award alimony on decreeing a dissolution of the marriage must be found in the statute expressly conferring the right * * * ". The court cited 2 Bishop on Marriage, Divorce and Separation, § 1039. The work was published in 1891. It also cited Stewart, Marriage and Divorce, § 364, which was published in 1887. I shall presently show that the great

weight of modern authority recognizes the inherent power of a court of equity to award alimony regardless of statute. The change in the weight of authority is well illustrated by comparing the 4th edition of Pomeroy's Equity Jurisprudence with the parallel section 1120 in the 5th edition. Since, as the majority holds, the duty to support under the separate maintenance statute and decree ended by reason of the divorce, the remaining question is whether an Oregon court has power to require the husband to continue to pay alimony after he, as plaintiff, has received an ex parte foreign decree of divorce, and if so, whether it can be done in this case. I address myself first, to the question of power.

If the Oregon court has the power to require the husband to continue the payment of alimony after he, as plaintiff, received a foreign decree of divorce, then it must be conceded that there would be persuasive reasons for considering the question on its merits in this case. The Oregon court has found the husband to be at fault. The decree in Nevada was based on a law in which fault was not at issue. The Nevada court never acquired personal jurisdiction of the wife. The wife never had a day in court as to her right to alimony, and, not being a resident of Nevada, could not have received a divorce there if she had appeared in the suit.

There is good authority for the proposition that where a wife in the state of her residence secures a divorce from her husband on substituted service, and therefore cannot secure a personal decree of support from him, she may later, by an independent suit, secure such an order in the state of her residence if she can get personal service upon him. 17 Am. Jur., Divorce and Separation, § 627, p. 482, § 630, p. 483; *Hutton v.*

*Dodge,* 58 Utah 228, 198 P. 165; *Ware v. Ware,* 144 Kan. 121, 58 P. (2d) 49; *Stephenson v. Stephenson,* 54 Ohio App. 239, 6 N. E. (2d) 1005; *Wick v. Wick,* 58 Ohio App. 72, 15 N. E. (2d) 780; *Adams v. Abbott,* 21 Wash. 29, 56 P. 931; 2 Nelson on Divorce, § 14.21, p. 26. The principle on which the decisions are based is well set forth in the analogous case of *Wagster v. Wagster,* 193 Ark. 902, 103 S. W. (2d) 638. It is also held that:

"Where the right subsequently to apply for alimony is preserved by reservation in the decree itself, an application for alimony may be made after the rendition of the judgment of divorce." 17 Am. Jur., Divorce and Separation, § 630.

In the case of *McFarlane v. McFarlane,* 43 Or. 477, 73 P. 203, 75 P. 139, the plaintiff brought suit in Oregon for divorce upon substituted service. She was awarded a decree. Several years later she filed a petition in the original divorce suit, seeking alimony. The defendant appeared specially, on the ground that the court was without jurisdiction. The court by Chief Justice Moore said:

" * * * The plaintiff was not obliged to take a decree in said suit, but, having done so, she thereby waived her right to alimony, costs, and attorney's fees; and, as our statute contains no provision allowing the court jurisdiction to pass upon these questions, when the defendant is found within the reach of its process, and the right to assume such jurisdiction never having existed at common law, the court erred in awarding plaintiff any sum whatever on account of alimony, attorney's fees, and costs in the original suit.

It is true that the plaintiff had no obligation to sue her husband for divorce but she had a statutory right to do so and to secure it upon substituted service. It is a strange theory which holds that the plaintiff

waived her right to alimony when the fact was that the court which granted the divorce had no jurisdiction to award it. Commenting upon this situation, we quote from a well-considered note in the Harvard Law Review:

"Where a decree for alimony is an award in personam and the husband is not within its jurisdiction, a court is powerless to award alimony. But if the wife later resorts to a court having personal jurisdiction over her erstwhile spouse, the public interest in requiring him to contribute to her support is often ignored, and it is held that a divorce without alimony is conclusive against a right to further support, because alimony cannot be granted after the marriage is terminated. This argument seems to overlook the fact that alimony after an absolute divorce is essentially a substitute for the terminated marital duty of support, rather than an embodiment of that duty, as it was when a divorce did not end the marriage. Subsequent suits have also been denied on the ground that the prior decree was 'res judicata' on the issue of alimony, or constituted a 'waiver' of the wife's right to support. A number of courts, however, have recognized that there is no juristic necessity for suing for alimony and divorce in one suit, that an issue cannot be res judicata where the proceeding is ex parte and the solution of the problem is beyond the jurisdiction of the court, and that piecemeal litigation is justified by necessity in this situation.

"Where it is the husband who obtains an ex parte divorce in another state, a few courts cling to the notion that subsequent decrees for alimony are impossible because his marital duties have ended; and such a divorce has even been held to terminate a prior order for separate support. But alimony is granted in a majority of the states, because there is no possibility of 'waiver' by the wife and the husband's conduct often approximates a fraudulent evasion of his duties to his family. * * *"

53 Harv. L. Rev. 1184; and see cases cited in the footnotes.

The McFarlane case is cited in a note (83 A. L. R. 1248), which deals with a wholly different problem. At the opening of the annotation it is said:

"The present annotation presupposes that the divorced wife seeks the alimony from the same court which has previously granted her a divorce. It assumes, generally, that the court would originally have had jurisdiction to award alimony."

It is also said that under statutes:

"It has been generally, though not invariably, held that statutes permitting modifications or changes as to alimony do not apply where no alimony has been granted in the decree." 83 A. L. R. 1250.

Many cases are cited. With three exceptions, one of them being the McFarlane case, the decisions cited in the note involved divorces obtained on personal service of the defendant. These cases are authority merely for the proposition that, when a court which has jurisdiction to award both divorce and alimony, makes no provision for alimony, it has no power under statutes like our own, to provide later for alimony upon motion in the original suit. This is the law of Oregon. *Saurman v. Saurman,* 131 Or. 117, 282 P. 111. The only cases cited in the note which support the McFarlane case are *Howell v. Howell,* 104 Cal. 45, 37 P. 770 and *Kelley v. Kelley,* 317 Ill. 104, 147 N. E. 659. Those cases apply the same rule where the plaintiff sues on substituted service, as is applied when the plaintiff secures a divorce on personal service. In all three cases the attempt was made by motion to open up the original final decree. No effort was made to bring an independent suit. If the McFarlane case is law, it must

be because, being an Oregon divorce, the Oregon stat-
ute is held to be a limitation on the power of the court.
I recognize that such is the general rule, but would
suppose that the Oregon statute might be liberally
construed to cover the case for reasons stated below.

If the McFarlane case is still deemed to be the law,
it is distinguishable from the case at bar. The plain-
tiff misconceived her remedy by seeking to open a
final decree on motion instead of bringing an inde-
pendent suit. Upon that point the Oregon court might
have followed, but did not follow, the procedure fol-
lowed in *Baird v. Baird,* 311 Mass. 329, 41 N. E. (2d)
5. In that state the court has statutory power to grant
alimony after a divorce. The plaintiff filed a motion
for modification in the original divorce suit but the
court treated it "in accordance with its essential sub-
stance" as a separate suit for alimony. The McFarlane
case is to be distinguished also from the case at bar
because in that case the wife brought the suit in Ore-
gon. In the case at bar the husband secured a foreign
divorce in Nevada. The wife could not have waived
her right to alimony when the husband brought the
suit, nor could he waive it for her. ·

The cases from other states which are cited supra
are persuasive but are not directly in point on the
question at issue. Where an Oregon court grants a
divorce to the wife on account of the fault of her hus-
band, the court normally has power to award alimony
as an incident thereto. The only reason that it cannot
give full relief in a case based on substituted service
is that it has jurisdiction over the status but not per-
sonal jurisdiction over the husband. It should logically
follow that upon getting personal service on the hus-
band at a later time, the court may exercise the latent
power which was vested in Oregon courts to grant ali-

mony as an incident to the divorce. This is merely an application of, and not an exception to the rule that alimony can be granted as an incident to an Oregon decree of divorce.

While the authorities are not unanimous, the better-reasoned decisions hold that after the husband has obtained a foreign divorce upon constructive service, the wife in the state of her residence may by an independent suit, secure an order for alimony if she obtains personal service upon her former husband.

" * * * Thus, if the wife secures a divorce from her husband, who is a nonresident, in a court having jurisdiction over him only by substituted service, the divorce decree is not a bar to the wife's subsequent application for alimony because jurisdiction to pass on the question of alimony was wanting in the divorce suit, even though there was sufficient to sustain a judgment affecting merely the marital status. This rule applies not only where the divorce decree was entered in the same state or country in which the application for alimony is made, but also where the wife procured a divorce in another state or country. Similarly, a divorce granted ex parte to the husband in another state the courts of which acquired no jurisdiction of the wife other than by substituted service does not bar the wife's right subsequently to apply for alimony, even though the decree is valid so far as the marital status is concerned. Under such circumstances a statute forbidding the allowance of alimony to a wife against whom her husband has secured a divorce has no application." 17 Am. Jur., Divorce and Separation, § 627.

In *Searles v. Searles,* 140 Minn. 385, 168 N. W. 133, the court said:

"In the divorce action in Washington jurisdiction was acquired of the defendant, this plaintiff, by substituted personal service in Minnesota as au-

thorized by the Washington statute which is similar to ours. The action was in rem. The res was the marriage status or relation existing between the parties. That was within the jurisdiction of the Washington court and the effect of its judgment was to destroy it. There was no determination of the question of alimony. The judgment, since it was in rem and operative only on the res, the marriage status, is not res judicata on an application for alimony. The wife, in such a situation as is before us, may maintain an independent action for alimony in the state of her residence and matrimonial domicil. This is the substantial effect of Thurston v. Thurston, 58 Minn. 279, 59 N. W. 1017, and the doctrine finds general though not universal support. See Toncray v. Toncray, 123 Tenn. 476, 131 S. W. 977, 34 L. R. A. (N. S.) 1106, Ann. Cas. 1912C, 284; Cox v. Cox, 19 Oh. St. 502, 2 Am. Rep. 415; Turner v. Turner, 44 Ala. 437; Cook v. Cook, 56 Wis. 195, 14 N. W. 33, 443, 43 Am. Rep. 706; note 34 L. R. A. (N. S.) 1106; note Ann. Cas. 1912C, 284, 289; note 77 Am. St. 228, 240; 1 Enc. Pl. & Pr. 415; 2 Nelson, Div. & Sep. § 936; 2 Bishop, Marr. & Div. § 844, et seq.; 1 R. C. L. 937.''

See also *Toncray v. Toncray,* 123 Tenn. 476, 131 S. W. 977; *Cox v. Cox,* 19 Ohio St. 502, 2 Am. Rep. 415; *Slapp v. Slapp,* 73 Ohio App. 444, 57 N. E. (2d) 81, 143 Ohio St. 105, 54 N. E. (2d) 153; *Sheridan v. Sheridan,* 213 Minn. 24, 4 N. W. (2d) 785, (and see comment on this case in 157 A. L. R. 1402); *Rodgers v. Rodgers,* 56 Kan. 483, 43 P. 779; *Cochran v. Cochran,* 42 Neb. 612, 60 N. W. 942; *Davis v. Davis,* 70 Colo. 37, 197 P. 241; *Thurston v. Thurston,* 58 Minn. 279, 59 N. W. 1017; 27 C. J. S., Divorce, § 231 (b) p. 947; 3 Nelson on Divorce, § 33.40, p. 510-11; 42 A. L. R., 1385 Note; Note to In re Popejoy, 77 Am. St. Rep. 241.

Although there is a conflict of authority, it has also been held that a prior decree for separate mainte-

nance may survive a foreign divorce obtained on substituted service. *Estin v. Estin*, 296 N. Y. 308, 73 N. E. (2d) 113; *Simonton v. Simonton*, 40 Ida. 751, 236 P. 863, 42 A. L. R. 1363; *Miller v. Miller*, 200 Iowa 1193, 206 N. W. 262; *Manney v. Manney*, (Ohio App.), 59 N. E. (2d) 755. In the Simonton case the right of the wife to alimony was asserted in an independent action. It was held that the separate maintenance decree continues in effect until modified. In the Miller case it appears that the right was asserted by a petition "in the nature of a creditor's bill". The court modified the maintenance decree. In *Manney v. Manney* and *Estin v. Estin* the issue was decided upon a motion made in the original case wherein the wife had been awarded separate maintenance. In the Manney case, upon the showing made by the former husband, the order was reduced from $50 to $35 a week. In *Commonwealth v. Esenwein*, 348 Pa. 455, 35 At. (2d) 335, 325 U. S. 279, 89 L. ed. 1608, the issue was raised by motion of the former husband in the original separate maintenance action. He asserted that he had become a resident of Nevada and had obtained a divorce. Upon that showing the trial court reduced the amount of alimony which had been fixed in the separate maintenance case. Thereafter he sought the entire cancellation of the support order but the court then held that his Nevada divorce was void for want of jurisdiction. The United States Supreme Court said that if the divorce had been valid, the maintenance order would not, under Pennsylvania law, have survived.

The cases which hold that the decree of separate maintenance may survive a foreign ex parte divorce must, it seems, be based on the power of a court of equity, though the courts do not expressly base the decisions on that ground. The only other basis which

could be claimed would be on the theory that the Oregon statute providing for separate maintenance in the case of married persons applies in cases where they are no longer married.

Speaking of the effect of a foreign divorce based on constructive service upon the power of a court of the wife's domicil to award alimony after obtaining personal jurisdiction of the former husband, the A. L. R. annotator makes the following pertinent comment:

" * * * to entitle the former wife to alimony, it must be held or assumed that the right to alimony is not exclusively an incident of divorce, but may be allowed independently thereof. That question is, of course, broader than the subject of the present annotation. It may be noted, however, that in a majority of states alimony may now be awarded in an independent suit therefor. 1 R. C. L. 879." 42 A. L. R. 1385.

He continues:

"Of course, in a jurisdiction where the former view still prevails, that alimony in merely incidental to a divorce, the previous decree of divorce, although rendered upon constructive service of process, is fatal to an independent suit for alimony, upon the present assumption that that decree dissolved the marriage relation.

"To entitle the former wife to alimony in an independent suit, it must not only appear that, according to the law of the state in which the question arises, alimony may be allowed independently of a suit for divorce, but that in some circumstances it may even survive the dissolution of the marriage relation." 42 A. L. R. 1386.

Obviously, if in a given state, alimony could only be awarded as an incident to a divorce or separate maintenance decree rendered in that state, it would follow that a court could not award alimony where the

parties had been divorced in a foreign state. The ultimate question in this case is whether an Oregon court has jurisdiction to award or continue a previous award of alimony when its action is not taken as an incident to an Oregon divorce. At common law the duty of a husband to support his wife is terminated by divorce. *Grush v. Grush,* 90 Mont. 381, 3 P. (2d) 402, 1 R. C. L., Alimony, § 15, p. 877, 17 Am. Jur., Divorce & Separation, § 513. It follows that unless there is statutory authority, or unless a court of equity has jurisdiction to intervene, there could be no allowance of alimony after divorce. The statute concerning separate maintenance, Or. Laws, 1941, ch. 408, p. 694, by its terms, applies expressly to the granting of alimony on account of a separation of *married persons.* In *Cohn v. Cohn,* 4 Wash. (2d) 322, 103 P. (2d) 366, the court said:

> "Separate maintenance is the allowance granted to a wife for the support of herself and children while she is living separate and apart from her husband. The right to separate maintenance is grounded upon the fundamental legal duty of the husband to support his wife during the time that the marriage relation exists. Though a legal separation has been decreed, the marital relation still exists. It anticipates that a future reconciliation may be brought about. It is otherwise where a divorce has been granted. In such case the marital relation is dissolved and the husband, aside from the support commanded by the decree, is not compelled to care for his former wife."

In *Magowan v. Magowan,* 57 N. J. Eq. 195, 39 A. 364, a bill was "filed by a wife against her husband for maintenance *under the statute.*" The husband had previously received a decree of divorce in Oklahoma. The court said:

> "* * * I am constrained to the conclusion that the decree of the Oklahoma court must in this suit

be regarded as a valid judgment. This being so, there can be no decree for the allowance of a sum for maintenance, inasmuch as such a decree is dependent upon the existence of the marital relations between the parties. Freeman v. Freeman, 49 N. J. Eq. 102; Lynde v. Lynde, 54 N. J. Eq. 473. * * *''

See *Patterson v. Patterson,* 82 Cal. App. (2d) 838, 187 P. (2d) 113; 27 Am. Jur., Husband and Wife, § 429, p. 34.

The Oregon divorce statute provides that "Whenever a marriage shall be declared void or dissolved, the court shall have power further to decree" for the recovery of alimony from the party in fault. O. C. L. A., § 9-914, as amended by ch. 228, Laws of 1947. It seems clear that when alimony is decreed in a suit for separate maintenance, the duty of the husband to pay as separate maintenance pursuant to the separate maintenance statute would terminate upon a showing that the parties are no longer husband and wife. If it should be held that after divorce, the husband must continue to pay for the support of his wife in the amounts prescribed in a previous separate maintenance suit, the payment so continued would be deemed alimony as between divorced persons and not separate maintenance. If an Oregon court has no authority to enter a decree for alimony after a foreign divorce, then it would not have the power to continue the provisions of a separate maintenance decree after the foreign divorce. On the other hand, if the Oregon court does have authority in an independent suit, to enter a decree for alimony after a foreign divorce, there could be no substantial objection to the making of an order continuing the separate maintenance decree. It would be continued, not as separate maintenance, but as alimony after divorce. The Oregon statutes, by their

terms, refer to the power of an Oregon court and authorize alimony only when the Oregon court dissolves the marriage or decrees separation. When a court of a foreign jurisdiction has dissolved the marriage, there appears to be no status in Oregon authorizing an Oregon court to enter a decree for alimony.

It remains to be determined whether the Oregon court has inherent equitable power to award alimony to the wife, a resident of Oregon, irrespective of statute, after the parties have been divorced at the suit of the husband upon substituted service by a foreign decree. From a note in 141 A. L. R., p. 402, we quote:

"By the overwhelming weight of American authority of later years, and especially of recent times, the original inherent jurisdiction of equity to grant alimony independently of divorce is freely sustained, both in cases in which the question was expressly raised and in those in which jurisdiction was exercised under the tacit assumption that it existed."

See also 141 A. L. R. 420; 27 Am. Jur., Husband and Wife, § 402, p. 9.

Decisions from 25 states support the text. Most of the authorities cited relate to the power of equity regardless of statute, to order the payment of alimony between married persons, but the decisions are not limited to that situation. We have already cited the cases which hold that a divorced wife may bring an independent suit for alimony on personal service in the state of her residence when the court which granted a foreign divorce on substituted service to her husband had no power to adjudicate the right of the wife. In the case of *Bray v. Landergren,* 161 Va. 699, 172 S. E. 252, the plaintiff in Virginia brought suit for divorce against her husband, a nonresident, upon substituted

service. There was no personal appearance by the defendant. The trial court granted the divorce and awarded alimony. On appeal the court upheld the inherent power of equity to award alimony but reversed the case because of want of personal service upon the defendant. In a well-considered opinion, the court said:

"The jurisdiction of our courts of equity in divorce cases is statutory. McCotter v. Carle, 149 Va. 584, 140 S. E. 670; Chandler v. Chandler, 132 Va. 418, 112 S. E. 856; Blankenship v. Blankenship, 125 Va. 595, 100 S. E. 538, and in Code, § 5111, as amended by Acts 1927 (Ex. Sess.) c. 85, provisions are made for alimony, but they are not exclusive.

"In this commonwealth, and indeed in most of the states, divorces at early dates were by act of the Legislature, but court of equity, at a time when they had no general jurisdiction to grant them, asserted and exercised jurisdiction to decree alimony."

The court referred to the case of *Purcell v. Purcell,* 4 Hen. & M. (14 Va.) 507, in which the plaintiff wife brought an independent suit for alimony without seeking divorce. In the Purcell suit, the chancellor said:

"If the jurisdiction of this court were now to be settled upon English precedents, there might be some doubt about the question, from the cases, as brought into one view, by Mr. Fonblanque; but I shall leave this clashing of English Judges to be reconciled among themselves, and take up the question upon first principles.

"I hold, that in every well regulated government there must somewhere exist a power of affording a remedy where the law affords none; and this peculiarly belongs to a Court of Equity; and as husband and wife are considered as one person in law, it is evident, that in this case the law can afford no remedy; which is universally admitted to be a sufficient ground to give this Court jurisdic-

tion; and therefore it must entertain the bill, if there be sufficient proof of the marriage."

Commenting upon this decision, the court in *Bray v. Landergren* said: "It will be observed that jurisdiction was here taken because law afforded no other relief." The court then stated that another appealing reason was set forth in 1 R. C. L., p. 876, and quoted with approval the following:

"Although the power to grant divorces had become identified with the legislative power as the result of long usage, the determination of the legal consequences flowing therefrom was so bound up with the property rights of the parties and so essentially judicial in its nature, that the courts were loath to allow the legislature to assume the same. Consequently, although courts of chancery would not assume jurisdiction over divorce in the absence of direct authorization, they nevertheless held that their general equity jurisdiction must be deemed to include the right to award alimony in a proper case, inasmuch as the ecclesiastical courts, to which such jurisdiction rightfully belonged at common law, had never constituted a part of our judicial system. Their conclusion was further strengthened by the fact that in England, during the commonwealth, the ecclesiastical courts were abolished, and in consequence thereof their entire jurisdiction in cases of alimony and of separate maintenance devolved, as a matter of course and necessity, upon the court of chancery as the only tribunal fitted and competent to decide thereon."

The court also quoted with approval from *Harris v. Harris*, 31 Grat. (72 Va.) 13, 17, as follows: "But the power of courts of equity to decree alimony did not originate in any statute. It is a power inherent in them." The court continued:

"It is said, however, that this power to award alimony by a court of equity, independent of stat-

ute, does not exist where the divorce is absolute, because in such a case there was no duty to support under the common law. 1 R. C. L., p. 877.

＂＊ ＊ ＊

"The situation in this country has now definitely changed. Unnumbered cases arise in which absolute divorces are granted for supervenient causes. In such cases the obligations to support are as cogent as they are when there is separation only. If a statute authorized these absolute decrees but gave the wife no right to alimony or to support from her delinquent husband, we would have a right without remedy which would be as appealing as was the situation in Purcell v. Purcell, supra. The same reasons for the intervention of equity which prevailed in one case, obtains in the other."

The court also quoted with approval from a note by Mr. Freeman to 60 Am. Dec. 667, as follows:

"And there are cases which hold that this principle of the incidental character of alimony extends to the divorce unknown to the ecclesiastical law— the divorce absolute, or a vinculo matrimonii, for causes other than marital incapacity; and therefore that, though not expressly authorized to grant alimony in such cases, the courts may nevertheless do so: Harris v. Harris, 31 Grat. [72 Va.] 13, 17; See Chaires v. Chaires, 10 Fla. 308, 312; Campbell v. Campbell, 37 Wis. 206, 220. But this doubt, of whatever weight, is removed generally by statutes which provide for alimony with all kinds of divorce."

The pending case is one of first impression in Oregon. The modern majority rule concerning the inherent power of equity, if approved, will make it possible for the courts of this state to do justice to a class of its citizens who would otherwise be without remedy. Where the former wife whose husband has

secured a divorce in a foreign jurisdiction on substituted service, secured personal service upon her husband in this state, a court of equity could upon full hearing, award to the former wife such relief, if any, as she might merit under well recognized rules of this jurisdiction concerning fault, ability to pay, clean hands and the like. Where the foreign decree was granted without reference to the fault of either party and without jurisdiction to award alimony or divorce to the wife, she, a resident of Oregon will be deprived of a day in court and of the right to show facts if such there be, entitling her to relief, unless equity perceiving the injustice of the situation and the inadequacy of any remedy at law, assumes jurisdiction.

Authorities from other states advise us that we should hold that Oregon courts have inherent equitable power to award alimony, subject only to the limitations imposed by our statutes. Where the legislature has made specific provision for the allowance of alimony in our statute on separate maintenance and in the statute on divorce and has specified the conditions upon which alimony may be granted, then it is clear that the jurisdiction of the Oregon court would be limited to the specific provision of the statute. That is to say, that where the legislature has covered the field, the power of equity would be limited by the statute and within that field the power of the court to award alimony would be limited to the provision of the statute. Our decisions are innumerable to the effect that the power of the Oregon court to grant separate maintenance or alimony upon divorce, is limited by the provisions of the statute. *Howard v. Howard,* 164 Or. 689, 103 P. (2d) 756; *Noble v. Noble,* 164 Or. 538, 103 P. (2d) 293; and many other cases.

The statutes of Oregon, however, do not cover the entire field. The question in this case is not within the purview of any statute. The provision of our divorce statute is that "Whenever a marriage shall be declared void or dissolved, the court shall have power to further decree" for the payment of alimony in certain cases. This statute refers only to the power of an Oregon court when that court renders a decree of divorce. The statute has no application to a case in which a divorce on substituted service has been granted in a foreign jurisdiction. We are at liberty therefore, without doing violence to our former decisions, to hold that equity has inherent power not limited by any statute to award alimony upon a proper showing, notwithstanding the fact that the parties have been divorced by a foreign decree on substituted service. This view harmonizes the apparently inconsistent statements in 17 Am. Jur., Divorce and Separation, § 513. In that section it is said:

> "* * * But in the case of an absolute divorce terminating the matrimonial ties, the duty of support no longer exists at common law, and in the absence of a statute continuing the obligation of maintenance beyond the dissolution of the marriage, it is difficult to find a basis for awarding permanent alimony. The better view would appear to be that the right to award permanent alimony on decreeing a dissolution of the marriage can be based solely upon express statutory provision. * * *"

None of the cases cited in support involved the power of a court of equity to award alimony after a foreign divorce on substituted service. They relate to cases in which the divorce is brought in a state in which there are statutory provisions concerning alimony when granted by the courts of that state. The

quoted provision therefore, is not inconsistent with the text in the later portion of the same section where it is said:

" * * * That a statutory provision, unless expressly declared to be exclusive, is not so is evident from the fact that equity frequently claims inherent jurisdiction over the subject of alimony, as where a wife is permitted to bring an action for alimony alone although she has previously been granted a divorce from her husband by a foreign court which was unable to award her alimony owing to lack of jurisdiction of both the person and property of the husband. Similarly, where a divorce has been obtained in another state by the husband in an ex parte proceeding, there being no jurisdiction of the person of the wife except by constructive service, she is allowed to maintain a separate action against him for the recovery of alimony; and equity assumes jurisdiction to award alimony where a separation has been previously granted by legislative enactment. Furthermore, the courts of a number of jurisdictions, upon well-reasoned grounds, claim that, aside from statute, equity has jurisdiction to award alimony in an independent suit for separate maintenance. Of course, in some jurisdictions, authority to award alimony is regulated entirely by statutory provisions which are deemed to be exclusive. It is obvious that if jurisdiction is otherwise lacking, it cannot be conferred by the consent of the parties."

The foregoing considerations and authorities lead to the conclusion that the Oregon court sitting in equity has jurisdiction to determine whether or not alimony should be awarded in the case at bar.

It is significant to note that, notwithstanding the divergent views which are expressed in the majority and dissenting opinions, all are agreed that in equity and good conscience the wife should not be deprived

of the right to alimony merely because of the foreign divorce in which her right could not be adjudicated. The question is whether we can find a remedy. Mr. Justice Lusk has clearly demonstrated that "what the legislature was concerned with in this act was the rights and duties of husband and wife as long as they continued to be such and no longer". I agree. I do not suggest that the court below by virtue of its inherent power should continue the separate maintenance decree after the divorce. That involves a contradiction in terms. I do suggest that the lower court can in this case exercise its equitable power and require alimony after divorce in such amount as seems equitable. I do not suggest that we "can say that Mrs. Rodda has commenced an independent suit for alimony after divorce". I do suggest that this court can properly remand the case with instructions to permit amendment, hear testimony and decide the issue.

The majority holds that the decree of the lower court must be affirmed. However, as I have attempted to show, the plaintiff would still have a right to bring an independent suit for alimony on the authority of the cases cited. Why then cannot the lower court consider in this case both the statutory and the equitable rights of the parties?

The case is before a court of equity. The defendant by motion invoked its jurisdiction. Both parties appeared personally. Upon a showing by the defendant that the parties are no longer married, the court issued a show-cause order requiring the plaintiff to show why the separate maintenance decree should not be vacated. The plaintiff's position below was that the Nevada decree, by virtue of its own force, ends his duty to pay alimony. The defendant's position was that the plain-

tiff never got a valid divorce in Nevada. Both were wrong. The order of the lower court is predicated upon the erroneous idea that it could not consider the case as one involving equitable powers and that the only question before it was whether or not the duty to pay under the separate maintenance law and decree survived the divorce.

Though the Nevada decree was not per se effective, the fact that the parties are no longer married is a material circumstance to which the Oregon court is required by its law to give consideration in determining whether the order for separate maintenance should be transformed into an order for alimony after divorce. The Oregon separate maintenance decree continues in force in any event until the Nevada decree has been brought to the attention of the Oregon court and until its effect is there determined. Although the decree of the lower court vacating the separate maintenance decree may have been based on an erroneous view of the law, still, for all we know, the decree may have been proper for reasons which were not presented to, or considered by the court. The separate maintenance decree was rendered nunc pro tunc as of February 1, 1944. The Nevada divorce was rendered on the 19th day of June, 1946, and the motion to vacate the separate maintenance decree was not filed until December, 1946. We do not know in what respect circumstances of the parties have changed. One or both of them may be remarried, and financial conditions may have changed. It is conceivable that the defendant who was granted the separate maintenance decree might no longer be entitled to it. It is also conceivable that she might be entitled to a smaller or to a larger allowance. One of the material circumstances which must be considered by the court is the fact that the marriage of the parties

has ceased to exist by reason of the divorce. That in itself constitutes a material change in the conditions prevailing at the time of the order for separate maintenance.

If the inherent power of equity to grant alimony after a foreign divorce on substituted service is recognized, there would appear to be no distinction in principle between an independent suit for alimony brought after a foreign decree based on substituted service and a proceeding such as this to determine whether or not to continue an order for separate maintenance entered prior to the foreign decree. The issue in either case would be the same though the evidence may be different. In either case, before an Oregon court of equity would award or continue alimony, it would have to be satisfied, as of the time of the inquiry, that the facts are such that if the applicant for alimony had sued her husband upon personal service in Oregon she would have been found entitled to divorce and alimony. *Slapp v. Slapp,* supra. The public policy as declared by statute would properly control the equity court upon this issue. On the issue of fault the previous Oregon decree of separate maintenance should be considered binding as of the date thereof, but even upon that issue, as well as upon questions considering the present financial or marital condition of the parties, the court should hear evidence as to circumstances subsequent to the award of separate maintenance and down to the time of the hearing upon the husband's motion to terminate the separate maintenance decree. After securing his Nevada divorce the plaintiff moved the Oregon court for an order requiring the defendant to show cause why the maintenance decree should not be "modified, cancelled, set aside and terminated". He showed one fact which required the court to recon-

sider the entire issue, not that the fact of the divorce alone determined the issue, but that it presented the entire question in a new and different light. The husband prevailed in his application to the lower court for an order vacating the separate maintenance decree. He had no need to appeal. Since the order of the lower court, though based upon erroneous view of the law, might nevertheless have been proper for other reasons, the case should be remanded to the circuit court with directions to consider whether under all the circumstances as they shall appear on a full hearing, including the circumstances of divorce, the plaintiff should be required to continue the support of the defendant. The court, exercising equitable powers, would have the right to vacate, modify or continue the alimony provisions of the separate maintenance decree. If the court finds that the former wife is still entitled to alimony, it may make a decree to that effect, not as a continuation of separate maintenance, but as alimony upon divorce.

It would seem to be a futile act to affirm the lower court if, as I have indicated, the plaintiff would have an immediate right to bring an independent suit to establish her rights to alimony.

Equity has not lost its ancient power to give a remedy where it finds a right to which the law gives no adequate protection. In *Williams v. Pacific Surety Co.,* 66 Or. 151, 127 P. 145, 131 P. 1021, 132 P. 959, 133 P. 1186, the court said:

"Article 1, Section 10, of our Constitution provides that 'every man shall have remedy by due course of law for injury done him in person, property or reputation,' and in pursuance of this provision (Section 983, L. O. L.) [now O. C. L. A., § 13-715] provides that 'when jurisdiction is, by

the organic law of this state, or by this code, or by any other statute conferred upon a court or judicial officer all the means to carry it into effect are also given; and in the exercise of the jurisdiction, if the course of the proceeding be not specifically pointed out by this code, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code.' This wipes out common-law procedure, as such, with all its delays and technicalities and leaves the court free to adopt such common-law procedure when in conformity with the spirit of the code, and to reject it when a procedure better calculated to facilitate the administration of justice presents itself. * * *''

In *Bartlett v. Bartlett*, 175 Or. 215, 152 P. (2d) 402, this court had a somewhat similar problem. An issue concerning the custody of a child was raised by a proceeding in habeas corpus. We held that the full inherent power of equity is available, not only to award custody, but also to determine certain collateral matters concerning support. We said, "It is no great strain upon the rules of pleading to treat the return on the writ as an answer and cross bill". In the Bartlett case we quoted with approval the following:

" 'When jurisdiction is, by the organic law of this state, or by this Code or any other statute, conferred on a court or judicial officer, all the means to carry it into effect are also given; and in the exercise of the jurisdiction, if the course of proceeding be not specifically pointed out by this Code, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this Code.' O. C. L. A. § 13-715. Patterson v. Horsefly Irrigation District, 157 Or. 1, 15, 69 P. (2d) 282, 70 P. (2d) 36; Williams v. Pacific Surety Co., 66 Or. 151, 127 P. 145."

We also quoted the following:

" 'Courts which have a true conception of the philosophy of equity constantly reiterate the fact that equity meets all conditions; that human ingenuity and human affairs can not create a condition which the long arm of the court of equity can not reach if injustice or wrong would otherwise result. See Harrigan v. Gilchrist, 121 Wis. 127 (99 N. W. 909, 936); Rice v. Van Vranken, 132 Misc. 82 (229 N. Y. S. 32).' Teachers' Ret. Fund Ass'n v. Pirie, 150 Or. 435, 445, 46 P. (2d) 105.''

*In re Pittock's Estate,* 102 Or. 47, 201 P. 428, an issue was presented by a petition in the probate department of the circuit court. It was contended that the relief sought was not available in the probate court but could be had only by a suit in equity. Referring to the statute which abolished county courts and vested the circuit court with probate jurisdiction, this court said:

" * * * The act did not lessen the jurisdiction of the Circuit Court in such districts but increased it by the addition of probate jurisdiction, which was formerly vested exclusively in the County Courts. When this litigation was presented to the Circuit Court, that tribunal was acting not only with respect to the probate jurisdiction but also to the general jurisdiction originally vested in such courts.''

Although the facts in the pending case are different from those in the cases last cited, the principle of those cases is applicable here. The majority opinion neither accepts nor rejects the doctrine of inherent equitable power. It would seem that the existence vel non of that power is properly before the court, for if the power exists, every consideration of justice would lead to its exercise. The court of Chancery, having jurisdiction

for one purpose will retain it for all purposes and will do complete justice as between the parties. *Williamson v. Hurlburt,* 99 Or. 336, 195 P. 562.

It may be objected that the issue raised by the defendant's motion and by the show-cause order is not broad enough to permit consideration of the equities of the case, even if an independent suit would lie. If that be the situation, then I think we should remand the case to the circuit court with leave to both parties to plead further. It would not be the first time that this court has authorized amendments in the interest of justice in an equity court. *Murray v. Lamb,* 168 Or. 596, 115 P. (2d) 336, 124 P. (2d) 531; *Enyart v. Merick,* 148 Or. 321, 34 P. (2d) 629; *Knapp v. Wallace,* 50 Or. 348, 92 P. 1054.

We cannot reverse this case because to do so would revive a dead statutory separate maintenance decree as such. We should not affirm the decree because to do so would be to deprive the defendant of the right to have her case decided on the merits. Since we cannot reverse and should not affirm, I suggest the middle ground of a remand with permission to amend.

I realize that the suggested procedure would not have been approved under technical rules of pleading as once administered. The plaintiff's motion may of course be construed as mere prayer to be relieved of the duty to pay *under the separate maintenance law,* but, more realistically, it seems that what the defendant is really concerned about, and really asks for, is relief from the duty to pay. He comes into court with unclean hands relying on a legal theory to relieve him of an equitable duty. Equity looks with jaundiced eye at such a request.

On motion to recall mandate and retax costs, filed January 21, 1949.

*Elton Watkins,* of Portland, for the motion.

*Joe P. Price* and *M. E. Tarshis,* both of Portland, contra.

MOTION GRANTED.

LUSK, C. J.

This is a motion to recall the mandate and retax the costs. The opinion in this case was rendered November 30, 1948. Costs and disbursements were allowed to the appellant, although the decision was in favor of the respondent. On December 24, 1948, the appellant filed a petition for a rehearing which was denied on January 5, 1949. On January 14, 1949, the clerk issued a mandate which contained, among other provisions, the following: "It is further ordered and decreed that the appellant have and recover of and from respondent her costs and disbursements in this court taxed at $35.00." On January 21, 1949, the appellant filed the aforesaid motion to recall the mandate and retax costs, accompanied by a statement of her costs and disbursements (commonly referred to as a cost bill) amounting in all to $430.00. In support of the motion there are affidavits of appellant's counsel in substance to the effect that he was under the impression that the time for filing the cost bill "would date from the decision of the court with reference to appellant's petition for rehearing."

Section 10-913, O. C. L. A., as amended by Ch. 23, Oregon Laws, 1943, provides:

"No disbursements shall be allowed in the supreme court to any party unless he shall serve

on the adverse party or his attorney, and file with the clerk of said court, a verified statement showing with reasonable certainty the items of all costs and disbursements in said cause. Such statement shall be accompanied by proof of service thereof and shall be filed within 20 days, or such further time as may be allowed by the court, from the time an opinion is rendered in the cause in said court, or, if no opinion is handed down, then within 20 days from the giving of a decision by such court. The total of the items included in the statement of costs and disbursements thus filed, with the exception of items or amounts thereof not allowed by law or by rules of the supreme court, shall be entered by the clerk of said court as a part of the judgment or decree, in favor of the party entitled thereto, unless the adverse party within five days from date of service of such statement shall serve and file his objections thereto, which objections must also be verified. Appearance fees, trial fees and attorney fees shall be allowed as a matter of course to the party entitled thereto, without the filing of a statement of disbursements.''

■ The only opinion rendered in this cause was that rendered on November 30, 1948. That opinion embodied the only decision of the court within the meaning of the foregoing statute. The order denying the petition for rehearing was not a decision of the case but merely the refusal of this court to disturb the decision theretofore announced. It is clear that the twenty-day period provided by the statute within which the appellant might have served and filed her cost bill began to run on November 30, 1948, and that the time was not extended by pendency of the petition for rehearing. *Empire Holding Co. v. Coshow*, 150 Or. 252, 268, 41 P. (2d) 426, 43 P. (2d) 907, 45 P. (2d) 167; *McFarlane v. McFarlane*, 43 Or. 477, 487, 488, 73 P. 203, 75 P. 139.

The statute, however, also provides that the cost bill may be filed within "such further time as may be allowed by the court". The question is presented, therefore, whether the court is authorized to make an order allowing such "further" time after the original twenty-day period has expired. Where, as is frequently if not usually the case, the statute reads that a court may "extend" the time granted for doing an act, it is uniformly held that the order must be made within the statutory time, because, as the court said in *State v. Scott*, 113 Mo. 559, 20 S. W. 1076: "The word 'extended,' as employed in this statute, means 'prolonged;' and of course a prolongation of time cannot occur after the time originally limited has expired." To the same effect see *State v. Cutberth*, 203 Mo. 579, 102 S. W. 658; *Schlosser Leather Co. v. Gillespie*, 157 Tenn. 166, 6 S. W. (2d) 328; *Crane Enamelware Co. v. Smith*, 168 Tenn. 203, 76 S. W. (2d) 644; *Coast Electric Service, Inc. v. Jensen*, 111 Cal. App. 124, 295 P. 346. See, also, *Rosin v. Lidgerwood Mfg. Co.*, 89 App. Div. 245, 86 N. Y. S. 49; *Wisconsin Cent. R. Co. v. Comstock*, 71 Wis. 88, 36 N. W. 843. A dictum in *Willis v. Lance*, 28 Or. 371, 382, 43 P. 384, 43 P. 487, supports this view of the meaning of the word "extension" in statutes of this character.

■ There is no such implication, however, from the words "such further time as may be allowed by the court". The word "further" in this context means "additional" (Funk & Wagnalls New Standard Dictionary), and there is no plain indication of legislative intention that the order allowing additional time must be made within the twenty-day period, as against the view that jurisdiction was conferred upon the court to make such an order after the expiration of that pe-

riod. Some slight evidence that the latter alternative is to be preferred may perhaps be found in the legislative departure from the conventional mode of expression. See, e. g., § 1-1007, O. C. L. A., "enlarge such time", and § 5-703, O. C. L. A., "within any extension that may be granted." In the absence of any controlling guide we are inclined to give the statute a liberal construction, and we, therefore, hold that the court is authorized to allow further time for filing the cost bill after the original twenty-day period has expired.

█ This leaves only the question of whether the appellant has made a showing which will justify the court in granting the relief sought. Her attorney frankly acknowledges that the delay was due to his own misinterpretation of the statute. It can be urged in his favor that it could be plausibly argued that the order denying the petition for rehearing was a "decision" within the meaning of § 10-913, O. C. L. A., as amended, although that interpretation is rendered inadmissible by *Empire Holding Co. v. Coshow*, supra, and *McFarlane v. McFarlane*, supra. These cases, however, while applicable and controlling, were constructions of a statute which has been superseded by the statute governing this case, and we do not think that the appellant should suffer because of the inadvertence of her attorney in overlooking them.

█ There can be no question but that the court has jurisdiction to recall the mandate (*Williams v. Pacific Surety Co.*, 66 Or. 151, 161, 127 P. 145, 131 P. 1021, 132 P. 959, 133 P. 1186; *Krause v. Oregon Steel Co.*, 50 Or. 88, 91, 91 P. 442, 92 P. 810), and this would seem to be necessary in any event, as that document provides for the recovery of appellant's costs and disbursements in the sum of only $35.00. This sum is made up of an ap-

pearance fee of $20.00 and an attorney's fee of $15.00. These items, together with a trial fee of $6.00, inadvertently omitted, the appellant "is allowed as a matter of course * * * without the filing of a statement of disbursements." § 10-913, O. C. L. A., as amended.

It is, therefore, ordered that the mandate be recalled, and that the appellant's statement of costs and disbursements heretofore presented to the clerk be filed.